JAMES AYLWARD *vs.* JOHN O'BRIEN.

Middlesex.    March 17, 20, 1893. — November 28, 1893.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, MORTON, LATHROP,
& BARKER, JJ.

*Rights of Pewholder — Adverse Possession — Demolition of Pews as Matter
of Expediency.*

Two conveyances of pews in a Roman Catholic church in the form of deeds, except
that neither of them was under seal or called for a seal, were executed in 1843
and 1852 by the Bishop, who owned the soil.   The conveyances ran to the gran-
tee and his heirs forever, subject to a condition, and described the terms on
which the grantee might lose his rights as owner.   The grantee brought an ac-
tion of tort for the destruction in 1885 of the pews by the defendant, a Roman
Catholic priest, who had them taken down under instructions of the archbishop.
Thereafter the society held religious services in a new church, and the old build-
ing was used for fairs, etc. given by the society, and for a Sunday school.   The
judge ordered a verdict for the defendant.   *Held,* that the plaintiff was entitled
to go to the jury on the question whether he had gained a title to the pews by
adverse possession, and that in respect to his rights as owner, if such title should
be established, the plaintiff stood in the same position as a pewholder in a
church of any other denomination under the general rules of law, which are, that,
if it has become necessary to take down a meeting-house if it has become so old
and ruinous that its further use is not practicable, the parish or proprietors need
not make payment to a pewholder for the removal of his pew; but if a meeting-
house is taken down, or the pews are removed merely as a matter of expediency,
the pewholders are entitled to payment.

TORT, for the alleged destruction of two pews in a church
building in Cambridge, and for the disturbance of the plaintiff's
rights as a pewholder therein.

At the trial in the Superior Court, before *Thompson, J.,* no
question was made as to the plaintiff's title to the pews; but
the defendant contended that they were owned only as pews in
a Roman Catholic church, according to the laws and usages of
that religious denomination.   It was not denied that the pews
were taken out and removed by order of the defendant, and a
stage erected where the altar had been, and the building devoted
to the purposes hereinafter described.

On March 19, 1842, one Binney and others conveyed to
Benedict Fenwick, then the Roman Catholic Bishop of Boston,

a parcel of land on Fourth Street in that part of Cambridge called East Cambridge, by a deed, which is in form a conveyance in fee simple, with the usual covenants. Upon this land a church, known as the Church of St. John in East Cambridge, was built, partly by persons who subscribed generally to a building fund, but whose several subscriptions, when they amounted to the sum of one hundred . dollars, were accepted as the subscription price for a pew, together with additional sums, to be determined by an auction sale of the right of choice among the subscribers when the church was completed; partly by smaller contributions from others, who did not subscribe for pews; and partly also by money raised on a mortgage on this property, afterwards paid off by all.

On April 3, 1843, Fenwick executed to one McGinley an instrument in writing, in the form of a deed not under seal or calling for a seal, conveying a pew in said church, then numbered 53, and afterwards numbered 65, the deed containing conditions that the grantee and his heirs should pay a certain quarterly contribution, and in default thereof should forfeit the pew, and that they should only sell the same by public auction. McGinley afterwards sold his right to the same to one Patrick King, and interlined before the *in testimonium* clause in said instrument the words, " Sale to Patrick King at public sale at one hundred thirty-seven dollars." King continued in the ownership of the pew until 1872, when it was sold and conveyed, by a writing indorsed thereon by the executrix of King, acting with his only heir, to the plaintiff; and afterwards, and down to the time of the acts complained of, the pew remained in his ownership and occupation, he paying all taxes thereon.

By the will of Fenwick, who died in 1846, the title to the church passed to John Bernard Fitzpatrick, Coadjutor Bishop, who on January 16, 1852, executed to one Walter Welch an instrument in writing identical in form with the instrument hereinbefore referred to, conveying a pew in said church then numbered 45 and afterwards numbered 57, which said Welch continued in the undisputed occupation and enjoyment of until May 23, 1855, when he transferred his right to the same to the plaintiff, by a writing which appears at the bottom of the instrument, and the plaintiff afterwards and down to the time of the

acts complained of remained in the undisputed occupation thereof, and paid all taxes thereon.

By the will of said Fitzpatrick, duly proved on May 14, 1866, the church property was devised, subject to certain trusts declared in the will of Fenwick, to the Bishop of Albany. He declining to accept the trusts, on May 20, 1867, John J. Williams, then and now the Roman Catholic Archbishop of Boston, was appointed trustee under the will of Fitzpatrick, and on January 6, 1873, was also appointed trustee under the will of Fenwick.

The plaintiff paid Welch $140 for pew No. 57, and always used it as a family pew for himself and his wife and children. For pew No. 65 he paid to King's executrix $250, and rented seats in it, of which there were six, at first for $1 each per quarter, afterwards for $1.50 each and latterly for $1.25 each per quarter. The pews, of which there were about one hundred in the church, were ordinary enclosures of wood, with doors and walnut railings and cushioned seats. It appeared that pews in the church were from time to time sold at auction, the time of such sales being announced by the parish priest from the altar, with the fact that they were to be sold on the premises. The church had in it an organ and altar, until they were removed as hereinafter stated, as well as the pictures and other furniture usual in Roman Catholic churches; and was always kept in substantial repair by the contributions of the whole congregation or society, of which the pewholders were but a small proportion.

The defendant is a Roman Catholic priest, and in March, 1873, was sent by Archbishop Williams, who is the Ordinary of the Roman Catholic diocese in which the church is situated, and has power so to do, to take charge of the parish of St. John's in East Cambridge, with special directions from said Williams to build a new church therein, the old edifice having become too small for the needs of the congregation or society. A lot of land not far from the old church was bought in May, 1873, and the defendant, under the directions and authority of the Archbishop, proceeded with the building, having announced his purpose so to do to the congregation accustomed to worship at St. John's Church, and procuring the means therefor by

subscriptions from individuals and in other ways from the congregation.

In the year 1876, when the basement of the new church was completed, and about ten years previous to the date of the writ in this action, the organ was removed by order of the defendant from St. John's Church to the basement of the new church, where religious services were from that time held, as well as in St. John's Church. The new church was fully completed by January 28, 1883, at which date it was dedicated; and thereafter no mass was celebrated in St. John's Church. The defendant announced, or caused it to be announced, from the altar of the new church, that mass would not be said in future in St. John's Church, and offered to the pewholders in St. John's Church, by way of compensation for their pews therein, the use for a limited period, rent free, of similar pews in the new church, until the rent of the same at usual rates would amount to the sum the pewholder paid for his pew in St. John's Church. He did not, however, offer to sell or convey any pews in the new church, (and none have ever been sold there,) nor to give to holders of pews in St. John's Church any rights as pewholders in the new church, it being against the present policy of the Roman Catholic Church, and according to his orders from the Archbishop. The defendant was requested by a few of the pewholders in St. John's Church to open said church for religious services therein, but always declined so to do. The altar was taken down by the defendant's orders, a raised platform was put in its place, and the church was used on Sundays for the Sunday school of the society; and the rooms in the basement were used by several charitable societies of the parish, a temperance society, and for other purposes of the congregation or society; but it has not been used for any purposes other than those of the congregation or society of St. John's Church.

In October, 1885, all the pews in the church, including those of the plaintiff, were taken down by order of the defendant, under the instructions of the Archbishop, and the woodwork thereof sold or destroyed; and since that time the church building has been, by the defendant's orders, or with his permission, used as a hall for a fair and other entertainments given by the

congregation or society of St. John's Church, its Sunday school and choir, for the benefit of said society, at which, at times, a charge for admittance has been made; and has also been used for a Sunday school.

The defendant offered evidence, uncontradicted by the plaintiff, to show that all his acts hereinbefore recited were done under the order and authority of Archbishop Williams, and, subject to the plaintiff's objection, was permitted, for the purpose of showing what powers there are and by whom said powers are exercised in the Roman Catholic Church regarding the holding and managing of property and real estate and the exercise of religious worship, to offer certain testimony as to the methods and usages of that denomination, and the decrees of the council held in 1868, showing that many of the ordinary corporate powers of proprietors of meeting-houses are vested in certain ecclesiastical officers; but neither the testimony nor the decrees touched the question of the rights of a pewholder who has a title to his pew.

The defendant further testified, that in everything he did, in regard to the erection of the new church and suspending services in the old church, he acted only under the directions of the Archbishop; that the Archbishop gave the defendant instructions to announce publicly to the congregation, on a certain Sunday, his determination that after that time there should be no more religious services for the society except in the new church; and it was so publicly announced from the altar on that Sunday to the society.

It further appeared, that on March 2, 1884, the defendant caused a notice to be read from the altar of the new church, to the effect that although the Archbishop agreed with the people of the parish in thinking that its best interests would be promoted by having no mass in St. John's Church, yet, to avoid all legal complications threatened by some few pewholders, and that the congregation or society might take formal and legal action on certain matters regarding St. John's Church, a meeting of the members of the Roman Catholic congregation or society of St. John's Church would be held on a certain evening in the body of the new church, to consider whether alterations should be made and the pews taken down in St. John's Church for the

purpose of giving more seating room and better convenience to the society or congregation. ·

On March 6, 1884, the meeting was held, from six hundred to seven hundred men, members of the congregation or society, being present, including the plaintiff. The defendant was chosen to preside at the meeting, and one McKenzie was made temporary clerk. About three hundred of those present, but not including the plaintiff, subscribed their names in a book to the following agreement; but the whole number present acted and voted on the matters presented at the meeting.

" The undersigned, members of the Roman Catholic society of St. John's Church in East Cambridge, Massachusetts, sign their names in formal consent to be and remain such members and to be governed by the by-laws and rules of said society, and to attempt no formal action inconsistent with their duties as members of the Roman Catholic Church, or in violation of the laws or usages of said Church."

Several votes were passed, including the following :

" Voted, that Geo. F. McKenzie be clerk for the current year.

" Voted, that henceforward mass be no longer celebrated in the old church of St. John upon Fourth Street.

" Voted, that to give more seating room and better conveniences, the pews in the old church (St. John) be taken down, and movable seats or pews be substituted therefor.

" Voted, that a committee of five be appointed by the chair to nominate and report to this meeting the names of three persons to act as appraisers to appraise the value of the pews before they are taken down."

The committee of five appointed by the chair nominated and reported three gentlemen to act as appraisers, who were respectively the president of a bank, an assessor, and a real estate auctioneer.

The report was accepted, and the meeting adjourned.

It did not appear that the society as thus constituted had ever held another meeting.

The proceedings at the meeting were proved by the clerk, McKenzie, who made a record of them in a book, beginning as follows : " St. John's Parish, Cambridge, March 6, 1884. Meet-

ing in the year 1884 of the members of the Roman Catholic Congregation or Society of St. John's Church in East Cambridge, called by public announcement from the altar on Sunday, March 2d, 1884, for the purpose of considering whether services be discontinued and the pews taken down in church building on Fourth Street." Except as herein stated, it did not appear that this was a meeting of the pewholders, or of the proprietors of a meeting-house, or of the members of a society, or that a clerk was elected or sworn, as provided in chapter 38 of the Public Statutes; nor that the appraisers chosen by said vote were appointed or acted in accordance with the provisions of said chapter.

It further appeared that the appraiser, who was a real estate auctioneer, had been in that business for many years, and had sold many pews in the church, selling in 1872 by auction a number for various prices, from $150 up to $300, and in 1878 and 1879 eight or nine for taxes, also by public auction, for $20 to $22.50 each./ The appraisers made a written appraisal of the pews at a value of six dollars each; and on cross-examination one of them testified that this sum was arrived at by taking the probable cost of the materials used in fitting up each pew, and deducting therefrom the diminution of this value by wear. The amount so awarded was publicly offered, but not tendered, to pewholders by the defendant; but none of them accepted the offer. It further appeared that the abandonment of the use of the old church was with the approval of the majority of the congregation or society.

The judge ruled that there was no organized parish of St. John, or unorganized parish or religious society, in the sense of chapter 38 of the Public Statutes; that there was no regularly called meeting of such society or parish, and no legal election of clerk thereof, or of appraisers of pews, and no proceedings for taking down the plaintiff's pews, and the appraisal thereof, under said chapter.

He further ruled that, the church building having been erected under the circumstances detailed, the defendant, as the parish priest, obeying only the orders of the Archbishop, or Ordinary, was not liable in this suit for closing the church, removing the pews, and devoting the church building to the uses described

in the evidence, against the will of the plaintiff, and without compensation to him.

The judge ordered a verdict for the defendant; and reported the case for the consideration of the Supreme Judicial Court.

If the plaintiff was not entitled to maintain his action, judgment was to be entered upon the verdict; otherwise, the case was to stand for trial.

The case was argued at the bar in March, 1893, and afterwards was submitted on the briefs to all the judges.

*R. D. Weston-Smith,* (*M. M. Weston* with him,) for the plaintiff.

*E. R. Hoar & C. J. McIntire,* for the defendant.

ALLEN, J. The plaintiff's rights must be determined independently of the statutes relating to the power of parishes or proprietors of meeting-houses to take down meeting-houses and destroy pews. Those statutes apply to proprietors of meeting-houses who have organized as corporations, and the powers given therein are to be exercised by the corporations. Pub. Sts. c. 38, §§ 27 *et seq.* There are also statutes providing specially how Roman Catholic churches may become incorporated; Pub. Sts. c. 38, §§ 48–50; St. 1879, c. 108; but it does not appear that the church or society in question ever became incorporated under these statutes.

Under the Eleventh Amendment of the Constitution, adopted in 1833, the Roman Catholic denomination stands on the same footing before the law as other religious sects and denominations, and in the present case, there being no statutes having a special application, the rights of the parties depend on general principles of law as applied in Massachusetts, and on the usages which have prevailed here. Not much light is to be got from decisions as to the rights of pewholders in England and elsewhere, where different laws, usages, and systems of religious administration have been established. *Attorney General* v. *Federal Street Meeting-house,* 3 Gray, 1, 64.

The first question is, what was the plaintiff's title? There was evidence as to this, and the report states that at the trial no question was made as to the plaintiff's title to the pews; but the defendant contended that they were owned only as pews are owned in a Roman Catholic church, according to the laws and

usages of that denomination. We have therefore to look into the report, to see what sort of a title the plaintiff had.

The title to the soil stood in the Archbishop. Prior to St. 1855, c. 122, pews (except in Boston) were real estate. Trespass would lie for interference with a pewholder's right to his pew. *Jackson* v. *Rounseville*, 5 Met. 127. A conveyance of the pew, therefore, should be by deed. The conveyances under which the plaintiff claims title were executed in 1843 and 1852 by the Archbishop, who owned the soil. These two conveyances were in the form of deeds, except that neither of them was under seal, nor called for a seal. This omission would render the conveyances ineffectual as deeds of real estate. But the plaintiff claims title by adverse possession. The conveyances ran to the grantees and their heirs forever; subject, however, to a condition. They also described the terms on which the grantees might lose their rights as owners. The conveyances were in form adapted to convey a good title to real estate in all respects except in the want of seals or words calling for seals, and the grantees occupying under them, if they understood their title to be good, as they may have done, had a basis upon which to begin an adverse possession. Whether the plaintiff had gained a title by adverse possession was a question of fact. The court could not rule against him, as matter of law, as to his title, and we think did not intend to do so. Certainly the plaintiff had a sufficient case for the jury, as to his title, unless the title to pews in a Catholic church is different from the title to pews in other churches.

There is nothing in the facts of the case to show that in 1843 or 1852 the title to pews in Catholic churches, when conveyed to individuals, was held by them in any different way, or that it conferred any different rights upon the pewholders, than in the churches of other religious denominations. The various pieces of testimony introduced to show the methods and usages of that denomination do not seem to touch the question of the rights of a pewholder who has a title to his pew. The decrees of the council held in 1868 go to show that many of the ordinary corporate powers of proprietors of meeting-houses are vested in certain ecclesiastical officers; but they do not reach the question what rights a pewholder acquires by virtue of his ownership of

a pew. In respect to these rights, the plaintiff as pewholder stood in the same position as a pewholder in a church of any other denomination, under the general rules and principles of law.

The general right of a pewholder, as between himself and the parish, or the proprietors of the meeting-house, is settled by a course of decisions. The parish, or the proprietors, may abandon the meeting-house as a place of public worship, without any liability to pewholders, although the pews may thereby be rendered nearly or quite useless; and the fact that the meeting-house is still fit to be used does not render the parish or the proprietors liable. *Fassett* v. *First Parish in Boylston,* 19 Pick. 361. It is within the power of the parish, or the proprietors, to determine whether to take down a church, or to make alterations and repairs. The pewholder cannot prevent them from doing this. The parish, or the proprietors, are the owners of the soil, and they may determine all matters relative to the structure to be maintained thereon. *Daniel* v. *Wood,* 1 Pick. 102. *Gay* v. *Baker,* 17 Mass. 435. *In re New South Meeting-house,* 13 Allen, 497, 517. Nevertheless, the right of the pewholder is held to be of such a nature that he is entitled to an indemnity, if the parish or the proprietors exercise their right to take down the church when it is in such a condition that its demolition is not actually necessary. If it has become necessary to take down a meeting-house, that is to say, if a meeting-house has become so old and ruinous that its further use is not practicable, the parish or proprietors need not make payment to a pewholder for the removal of his pew. But if a meeting-house is taken down or the pews are removed merely as a matter of expediency, the pewholders are entitled to payment. This rule has been so often stated and maintained, that it must be taken to be the settled law of this Commonwealth, however the law may be elsewhere. *Howard* v. *First Parish in North Bridgewater,* 7 Pick. 138. *Kimball* v. *Second Parish in Rowley,* 24 Pick. 347, 349. *Gorton* v. *Hadsell,* 9 Cush. 508. *Wentworth* v. *First Parish in Canton,* 3 Pick. 344.

It is obvious that, if for any reason the place of public worship has been changed, so that religious services are no longer held in the church which was formerly used for that purpose, the value of a pew is much diminished; but when such change has

been made merely from reasons of expediency, the parish or proprietors cannot go on and demolish the pew without making compensation to the owner of it. He still has an existing right, which may not be very valuable, but which, nevertheless, is entitled to recognition under the laws. Religious services may be re-established there, or other uses of his pew may be open to the pewholder.

The Archbishop had no greater rights in respect to the demolition of the plaintiff's pews than an organized religious corporation of any other denomination would have had, by reason of its ownership of the church. The right of the pewholder is not subject to the absolute power of such a corporation to destroy the pew; and it could not properly be ruled, as matter of law, that the plaintiff's rights were wholly gone.

Under the terms of the report, in the opinion of a majority of the court, the verdict must be set aside, and the case stand for trial. *Case to stand for trial.*